IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

LOUIS WILKINS,

    Plaintiff,

v.

UNUM LIFE INSURANCE COMPANY OF AMERICA; HSBC NORTH AMERICA HOLDINGS, INC. LONG TERM DISABILITY PLAN,

    Defendants.

No. C 10-02940 JSW

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Now before the Court is the bench trial in the above captioned matter. Having reviewed the administrative record and the parties' arguments, the extrinsic evidence properly before the Court, and based on this Court's findings of fact, for the reasons set forth in the this Order, the Court concludes that Unum Life Insurance Company of America ("Unum") wrongfully determined that Plaintiff Louis Wilkins ("Wilkins") was not disabled under the terms of the group disability insurance policy (the "Policy").

**BACKGROUND**

Wilkins injured his back and applied for disability benefits under the Policy. Wilkins also has an individual disability insurance policy with Unum. Unum determined that Wilkins was not disabled under the terms of the Policy, but that he was disabled under the terms of the individual policy.

///

The Policy defines disability as follows:

- you are limited from performing the material and substantial duties of your regular occupation due to your sickness or injury; and
- you have a 20% or more loss in your indexed monthly earnings due to the same sickness or injury.

(POL-15).[1] The Policy defines "regular occupation" as:

the occupation you are routinely performing when your disability begins. Unum will look at your occupation as it is normally performed in the national economy, instead of how the work tasks are performed for a specific employer or at a specific location.

(POL-30).

The individual policy defines disability as: "[y]ou are Totally Disabled, Partially Disabled or Residually Disabled due to Injury or Sickness." (CL 1217). The individual policy further defines "totally disabled" as "a Disability that renders You unable to perform with reasonable continuity the substantial and material acts necessary to pursue Your Usual Occupation in the usual and customary way." (CL 1220). "Usual Occupation" is defined as "the occupation in which You are regularly performing when Your Disability begins." (*Id.*).

Before he was injured, Wilkins was employed an assistant sales manager for HSBC North America Holdings, Inc. ("HSBC"). Unum determined that Wilkins:

was responsible for assisting the Branch Sales Manager in the daily operations of a branch office. This involved training and supervising branch employees and, as a team, promoting and marketing loans products and services. Staffing and training appear to be a major component of the job description. [Wilkins] would have to ensure that the branch was adequately staffed and the staff was knowledgeable about the products offered. He was responsible for the operation of the branch in the absence of the Branch Sales Manager. He had auditing and reporting duties as well for sales, productivity and profitability.

(CL 315.) Unum classified the physical demands of Wilkins' actual occupational duties as falling within "the sedentary to light range of exertion." (CL 316.) Unum found that:

[p]rolonged standing and walking would be necessary at times when greeting and talking to customers and other staff members. Training responsibilities might also require prolonged standing on occasion. Sitting would be performed during meetings or when performing desk or computer work.

---

[1] This definition is applicable during the first 24 months of disability payments. After that time, the Policy defines disabled as "unable to perform the duties of any gainful occupation for which you are reasonably fitted by education, training or experience." (POL-15.)

(CL 315-16). In terms of the cognitive demands of Wilkins' position, Unum found that the demands "include the ability to sustain attention and concentration, attend to detail, perform mathematical calculations, supervise and coordinate the work activities of others, plan, organize, prioritize, and communicate clearly via speaking and writing." (CL 316.)

Unum relied on the Dictionary of Occupational Titles ("DOT") for assistant branch manager for the description of Wilkins' occupation in the national economy. The DOT occupational description is:

> Assists the Branch Manager with all aspects of the individual branch operation in accordance with company policies and procedures, including customer service and satisfaction, directing training, and developing personnel, and satisfying all housekeeping, merchandising, and operating standards.

(CL 826.) The DOT further describes the material and substantial duties of an assistant branch manager as:

> Assists the Branch Manager in the control of all variable expenses
> Assumes the responsibilities of Branch Manager in the absence of the Branch Manager
> Promotes a pleasant and productive work environment within the branch
> Assists the Branch Manager in achieving budgeted sales, gross profit, and expense lines within the branch
> Assists in the selection, training, supervision, and evaluation of branch personnel and ensures their attainment of high individual productivity as well as the achievement of the responsibilities and duties contained in their job descriptions
> Maintains favorable community relations by dealing with customers directly and fairly, representing the branch, organization, or corporation in a positive manner
> Assists the Branch Manager to ensure that all company policies and procedures are followed in all aspects of the operations and all branch personnel understand and comply with all State and Federal rules, regulations, and laws
> Works within company policy, preserving the security of all company assets

(CL 827.) The DOT classifies the occupational demands as "Strength Sedentary Work[.] Mostly sitting, may involve standing or walking for brief periods of time." (*Id.*)

Wilkins' last day of work at HSBC was May 14, 2008.[2] (CL 5.) In his December 6, 2008 claimant's statement, Wilkins stated that he suffered from constant back pain, which required him to take prescription medicine that caused dizziness and drowsiness. (CL 66.) Dr. Matthew Huey submitted a statement to Unum in which he indicated that Mr. Wilkins suffered

---

[2] Wilkins argues that his last date of work was May 19, 2008. However, the evidence to which Wilkins cites does not provide support for this fact.

3

from spinal stenosis and chronic low back pain, and that "patient remains disabled and unable to work." (CL 91.) An MRI of the lumbar spine conducted on September 3, 2008, showed disc bulges and protrusions, including mild spondylosis at the L3-L4 and L-4-L5 interspaces with T2 signal loss in the discs (indicating dehydration) and disc space narrowing, a 2mm disc bulge at L3-L4, and at L4-L5:

> a 3mm broad based posterior and bilateral intraforaminal disc protrusion. The protruded disc is associated with a left posterior paracentral, inferiorly herniated and extruded disc fragment. The disc fragment has a mediolateral extent of 10 mm, and anteroposterior extent of 7 mm and a craniocaudal height of 12 mm. The herniated extruded disc fragment is responsible for moderate left L4-L5 lateral recess stenosis where it posteriorly displaces compresses and distorts the L5 nerve root in the lateral recess. The right lateral recess is not significantly compromised. The broad based posterior disc protrusion of L4-L5 is responsible for mild bilateral L4-L5 neural foramina stenosis.

(CL 178.) The MRI also showed lumbar muscular spasm. (CL 178.) A cervical MRI of the same date showed disc protrusions at C5-C6 and C6-C7, as well as cervical muscular spasm. (CL 145.)

In June 2008, Wilkins described his back pain as a constant sensation like "the point of a bayonet into his back, and at times it feels like a 'shock' sensation through his back. ... The pain is made worse by prolonged sitting, standing, or even a basic movement such as twisting. ..." (CL 199.) Wilkins had tried medications such as "meloxican, soma, oxazepran, Norco (which was prescribed to replace Vicodin ES, which was no longer helpful)." (*Id*.) His medication prescriptions at that time included hydrocodone. (CL 199.)

Wilkins informed Unum that his pain medication impairs his cognitive senses and that on his medication he "can't stay awake, can't concentrate, can't take [sic] about finances, hard to remember things." (CL 296.) Wilkins received epidural steroid injections on December 1, 2008, January 7, 2009, and Feburary 4, 2009, in an effort to combat his pain. (CL 373, 714, and 718.) Dr. Huey stated to Unum that Wilkins "has a very significant herniated disk if you've seen the report of his MRI." (CL 633.)

On March 11, 2009, Dr. Huey examined Wilkins and restricted him to standing, walking, or sitting for no more than twenty minutes at a time. (CL 824.)

4

1   Unum scheduled an independent medical examination ("IME") for Wilkins, which took
2   place on April 29, 2009, with Dr. Satish Kumar Lal, a board-certified orthopedist. (CL 863-73.)
3   Dr. Lal observed Wilkins and noted that he kept his back stiff when he walked and put less
4   weight on his right foot. Dr. Lal further observed that Wilkins' forward flexion, extension,
5   lateral bending, and rotation to either side was limited. (CL 867-68.) Wilkins' straight leg
6   raising tests were positive with the right lower limb when he was sitting and were positive with
7   both legs when he was supine. "Straight leg tests are associated with complaints of pain over
8   the lower back area." (CL 868.) Dr. Lal also reviewed Wilkins' medical records, including the
9   MRI. Dr. Lal's impressions were that Wilkins had a large, extruded disc at L4-5, a
10  degenerative bulging disk at L3-4, degenerative facet arthritis of the lower lumbar spine, low
11  back pain, and right lower limb radiculopathy. (CL 869.)

12  Dr. Lal conducted an extensive interview of Wilkins, reviewed of Wilkins' medical
13  records, and performed a complete physical examination. Dr. Lal concluded, based upon
14  Wilkins' "worsening symptoms, the significant objective findings noted on the MRI of the
15  lumbar spine and during the physical examination performed..., as well as the failure of
16  conservative treatment, including physical therapy, chiropractic treatment, and a series of
17  epidural steroidal injections," that Wilkins "should be given the benefit of surgery for
18  laminectomy and disectomy at L4-5 with possible fusion at L4-5." (CL 870.) Dr. Lal further
19  concluded that Wilkins was "capable of performing a semi-sedentary job that allows him to
20  frequently change his position between sitting, standing and walking." Dr. Lal restricted
21  Wilkins from standing, walking, or sitting for more than one half-hour at a time. (CL 871.) Dr.
22  Lal also found that Wilkins should not be allowed to drive because of the strong pain
23  medication he was taking. (*Id.*)

24  On June 4, 2009, Dr. Lal clarified that Wilkins could perform semi-sedentary work
25  duties for eight hours a day, as long as the restrictions detailed in his earlier report were
26  followed. (CL 969.)

27  Surveillance was conducted of Wilkins on June 8, June 9, June 17, and June 18, 2009.
28  (CL 982-1002, 1024-1046.) On June 17, 2009, Wilkins was observed driving a couple of hours

to a cat show and showing cats during the day. (CL 1024-1037.) Dr. Lal, after viewing the CD recordings and reviewing the written report of the surveillance, did not alter his conclusions that Wilkins should be restricted to semi-sedentary work with frequent breaks from sitting, standing and walking. (CL 1085-1087.)

Unum followed up with Dr. Lal again, sending him a one page letter requesting his opinion as to whether he believed Wilkins could perform a sedentary position (defined as exerting up to ten pounds of force and sitting for most of the time, but could involve standing or walking for brief periods of time) for eight hours a day, forty hours a week. (CL 1099.) With no explanation provided, Dr. Lal checked "yes" next to sedentary work for eight hours a day, forty hours a week. (CL 1101.)

Based on Dr. Lal's independent medical evaluation conducted on April 29, 2009, Unum concluded that due to the limitations in Dr. Lal's report, including that Wilkins was limited to semi-sedentary capacity with the ability to sit, stand or walk for one half-hour at a time, that Wilkins could not perform his own occupation at HSBC. (IDI 867-868.) Unum found that Wilkins would be required to perform prolonged standing and walking at times when greeting and talking to customers and other staff members, that training responsibilities might also require prolonged standing on occasion, and that sitting would be preformed during meetings or when performing desk or computer work. (*Id.*)

On August 22, 2009, Wilkins had another lumbar MRI. The MRI showed "degenerative changes most significant at L4-L5." (CL 1128). Dr. Kris Kiyoshi Hirata placed Wilkins on modified activity at work and at home. Wilkins' activity was limited standing continuously for no more than 30 minutes at one time, no more than 40 cumulative minutes in an hour, for no more that 6 hours per day, 5 days per week. Dr. Hirata imposed the same limitations for siting and walking. (CL 1321-1324.)

On April 2, 2010, Wilkins had back surgery, which involved posterior spine fusion and right hemilaminectomy at L4-5. (CL 1318.)

///

///

6

**ANALYSIS**

**A.     Disability Determination.**

This action is governed by the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001 *et seq.* ("ERISA"). The parties agree that *de novo* review applies. Pursuant to the parties' agreement and Federal Rule of Civil Procedure 52(a), the Court is conducting a bench trial based on the administrative record, as well as the extrinsic evidence submitted to the Court.

Under *de novo* review, the Court must determine whether Wilkins is disabled and entitled to long term disability benefits under the Policy without deference to either party's interpretation. *See Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 2006) (Under de novo review, "[t]he court simply proceeds to evaluate whether the plan administrator correctly or incorrectly denied benefits."). The Court will evaluate the persuasiveness of the conflicting testimony and decide which is more likely true. *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1095 (9th Cir. 1999). Therefore, the Court must determine whether Wilkins is "entitled to benefits based on the evidence in the administrative record and other evidence as might be admissible under the restrictive rule of *Mongeluzo [v. Baxter Travenol Long Term Disability Benefit Plan*, 46 F.3d 938 (9th Cir. 1995)]." *Opeta v. Nw. Airlines Pension Plan for Contract Employees*, 484 F.3d 1211, 1217 (9th Cir. 2007) (internal quotation omitted). "[T]he district court should exercise its discretion to consider evidence outside of the administrative record *only* when circumstances *clearly establish* that additional evidence is *necessary* to conduct an adequate de novo review of the benefit decision." *Id.* (internal quotations omitted) (emphasis in original). The extrinsic evidence at issue here relates to Unum's consideration of Wilkins' disability claim under his individual policy. In light of the similarity between the two policies, the Court finds the evidence relating to Wilkin's claim under his individual policy is necessary to conduct an adequate *de novo* review of the benefits decision. *See Opeta*, 484 F.3d at 1217.

Wilkins bears the burden of showing by a preponderance of the evidence that he is entitled to benefits under the Policy. *See Sabatino v. Liberty Life Assurance Co. of Boston*, 286

7

1  F. Supp.2d 1222, 1232 (N.D. Cal. 2003). Upon review of the record, the Court finds that
2  Wilkins has satisfied his burden of demonstrating he is entitled to long term disability benefits
3  under the plan. There is substantial evidence in the record to support the limitations imposed by
4  several doctors, including the independent medical evaluator hired by Unum, that Wilkins is
5  restricted from walking, sitting, or standing continuously for no more than 30 minutes at a time.
6  Upon review of the job description provided by the DOT, and considering Unum's own
7  evaluation of the similar job description provided by HSBC, the Court finds that Wilkins was
8  precluded from performing his occupation in the national economy.

To demonstrate otherwise, Unum relies heavily on the one day of surveillance showing, what it considers to be, substantial activity inconsistent with Wilkins' complaints of pain. However, the Court notes that Unum's independent medical evaluator reviewed the surveillance materials and found that they did not alter his findings that Wilkins was limited to semi-sedentary work and that he was restricted from walking, standing, or sitting for more than one half-hour at a time. (CL 1085-1087.)

Unum also tries to distinguish the job description provided by Wilkins' former employer, HSBC, from the description provided by the DOT. The Court finds that a comparison of the job duties in these two descriptions shows that they do not vary significantly. The Court notes that, in finding Wilkins disabled under his individual policy, Unum found that Wilkins would be required to perform prolonged standing and walking at times when greeting and talking to customers and other staff members, that training responsibilities might also require prolonged standing on occasion, and that sitting would be preformed during meetings or when performing desk or computer work. (IDI 867-868.) The occupational description, including the material and substantial duties of the assistant branch manager in the DOT, provides that an assistant branch manager deals with customers and assists with the training, supervision and evaluation of personnel. (CL 826-27.)

Lastly, Unum relies on the one page response from Dr. Lal, without any explanation, that Wilkins could perform sedentary work for eight hours a day, forty hours a week. (CL 1101.) Because this one page supplement does not explain why Dr. Lal changed his mind from

8

limiting Wilkins to semi-sedentary work and does not address his earlier restrictions to no more than 30 minutes of sitting, standing, or walking, the Court does not give this one page response much weight.

Accordingly, the Court finds that Wilkins was disabled under the terms of the Policy and thus entitled to long term disability benefits.

**B.     Remedy.**

Through this action, Wilkins seeks a determination that he is disabled under the definition applicable to the first 24 months of disability payments, *i.e.*, that he is limited from performing the material and substantial duties of his regular occupation. Wilkins did not argue, and Unum did not consider, whether Wilkins would qualify as disabled under the definition after 24 months of disability payments, *i.e.*, whether Wilkins is unable to perform the duties of any gainful occupation for which his is reasonably fitted by education, training or experience. Because there is no evidence in the administrative record about whether Wilkins is disabled under the broader definition of any gainful occupation, it would be error for the Court to award benefits beyond the initial 24-month disability period. *See Saffle v. Sierra Pacific Power Co. Bargaining Unit Long Term Disability Income Plan*, 85 F.3d 455, 460 (9th Cir. 1996). However, it would also be error for the Court to do as Unum requests and issue judgment against Wilkins on the issue of whether he qualifies as disabled under the broader definition. This issue simply was not addressed in the administrative record and was not presented to the Court. Therefore, this Order is limited to addressing the issue of Wilkins' entitlement to disability benefits for the initial 24-month disability period.

Wilkins demonstrates that his disability benefits for this 24-month period amounts to $4,458.54 per month and that the award amount should be reduced by $917 per month for the disability payments owed to Wilkins between May 22, 2008 through May 22, 2009 and should be reduced by $2,231 per month starting in November 2009.

Wilkins states that the Court may, in its discretion, award reasonable attorneys' fees and prejudgment interest. However, Wilkins does not even argue, let alone demonstrate, why an award of attorneys' fees and/or prejudgment would be warranted in this case. Nor does Wilkins

9

address what the amounts of such awards, if granted, should be. Accordingly, the Court will not award attorneys' fees or prejudgment interest.

## CONCLUSION

For the foregoing reasons, the Court finds in favor of Wilkins and against Unum. Unum wrongfully determined that Wilkins was not disabled during the initial 24-month disability period.

**IT IS SO ORDERED.**

Dated: September 24, 2013



JEFFREY S. WHITE
UNITED STATES DISTRICT JUDGE